# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JEAN BERNIER,

                                                          Plaintiff,

          v.                                                          9:17-CV-0254
                                                                      (DNH/ATB)
CARL KOENIGSMANN, et al.,

                                                          Defendants.

JEAN BERNIER, Plaintiff, pro se
JAMES A. MEGGESTO, ESQ., for Defendant Jeavons
NICOLE HAIMSON, ESQ., for Defendants Koenigsmann, Jones, Coryer, Donnelly,
   O'Connor-Ryerson, Gilfus, Hesse, Ashley, Gardner, Dinello and Mueller

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for Report and Recommendation, pursuant to 28

U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).  In the relevant portions of this civil

rights complaint, plaintiff alleges that the defendants violated his constitutional rights

while he was incarcerated at Auburn Correctional Facility ("Auburn C.F.") and

Southport Correctional Facility ("Southport C.F.") between June 2013 and June 2015.

(Second Amended Complaint ("SAC") at 10-25) (Dkt. No. 64).[1]

## I.    Relevant Procedural History

Plaintiff filed his original complaint in the United States District Court for the

Western District of New York on March 6, 2015.  (Dkt. No. 1).  He subsequently filed

---

[1]Although plaintiff has labeled this pleading "Amended Complaint Pursuant to 42 U.S.C.
§ 1983", it is actually the second amended complaint filed in this action (*See* Dkt. Nos. 1, 20,
64), thus the court will refer to it as such throughout this Report-Recommendation.

an amended complaint on September 14, 2015.  (Dkt. No. 20).  On February 15, 2017, several of plaintiff's claims were severed and transferred to the Northern District of New York.  (Dkt. Nos. 50, 51).  Plaintiff then moved to amend his complaint in the Northern District, and plaintiff's SAC was accepted for filing on June 30, 2017.  (Dkt. Nos. 57, 63, 64).

On July 28, 2017, the defendants[2] filed a partial motion to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6).  (Dkt. No. 71).  On March 15, 2018, District Court Judge David N. Hurd adopted my report-recommendation ordering dismissal of certain defendants and claims contained in the SAC.  (Dkt. Nos. 96, 104).  Judge Hurd dismissed several other defendants from this action on July 30, 2019, at the request of the plaintiff and upon consent from the defendants.[3]  (Dkt. Nos. 143, 144, 145).

The remaining claims and defendants are as follows:

(1)    Eighth Amendment medical indifference claims against defendants Ashley and O'Connor-Ryerson.  Plaintiff alleges that these defendants violated his constitutional rights when they discontinued his triple combination therapy treatment for the Hepatitis C virus ("HCV") after he was transferred to Auburn C.F. in June 2013.

(2)    Eighth Amendment medical indifference claims against defendants Koenigsmann, Mueller, Dinello, Jones, Coryer, O'Connor-Ryerson, Ashley, Gardner, and Jeavons.  Plaintiff alleges that these defendants violated his constitutional rights when they delayed his evaluation for, and ultimately denied him, HCV treatment in 2015.

---

[2]At the time the motion to dismiss was filed, all defendants were represented by the New York Attorney General's Office.  The defendants retained outside counsel in October 2019.  (Dkt. Nos. 151, 153, 154).

[3]Another named defendant, Wesley Canfield, was dismissed from this action on May 4, 2020, in light of a Suggestion of Death filed by defendants and the failure of plaintiff to substitute the deceased defendant's estate.  (Dkt. Nos. 170, 187).

(3)   First Amendment retaliation claims against defendants Ashley, O'Connor-Ryerson, and Jeavons.  Plaintiff alleges that these defendants intentionally delayed plaintiff's evaluation for HCV treatment in 2015, in retaliation for plaintiff filing a grievance against defendants Ashley and O'Connor-Ryerson in 2013 concerning the discontinuation of his triple combination therapy treatment.

(4)   First Amendment retaliation claims against defendants Hesse, Gilfus, and Donnelly.  Plaintiff alleges that these defendants destroyed his legal documents and tampered with his property, in retaliation for plaintiff filing a grievance and lawsuit against Hesse concerning interference with plaintiff's program placement.

Presently before the court are the defendants' motions for summary judgment pursuant to Fed. R. Civ. P. 56, collectively seeking dismissal of the SAC in its entirety.[4] (Dkt. Nos. 210, 213).  The Wilson Elser defendants responded to defendant Jeavons's motion on November 23, 2020 (Dkt. No. 217), to which defendant Jeavons filed a reply on December 1, 2020.  (Dkt. No. 218).  Plaintiff filed an opposition to the pending motions for summary judgment on March 26, 2021.  (Dkt. No. 223).  Defendant Jeavons replied on April 8, 2021.  (Dkt. No. 227).   For the reasons stated below, the court recommends granting the defendants' motions for summary judgment and dismissing the remaining claims in the SAC against all of the remaining defendants.

---

[4]There are two summary judgment motions presently pending before this court.  For the sake of brevity, defendants Koenigsmann, Jones, Coryer, Donnelly, O'Connor-Ryerson, Gilfus, Hesse, Ashley, Gardner, Dinello, and Mueller will collectively be referred to as the "Wilson Elser"defendants, based on the name of the law firm that now represents all of them.  The Wilson Elser defendants filed their motion for summary judgment on October 28, 2020.  (Dkt. No. 210). Defendant Jeavons filed her motion for summary judgment on November 3, 2020.  (Dkt. No. 213).

## II.    Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006).  "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).  It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment.  *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial.  *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant.  *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

Local Rules of the Northern District of New York require that a motion for summary judgment be accompanied by a statement of material facts which sets forth, in numbered paragraphs, "a short and concise statement of each material fact about which the moving party contends there exists no genuine issue." Local Rule 56.1(a).[5]  The same rule requires the opposing party to file a response to the moving party's statement of material facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issues arise.  Local Rule 56.1(b)*.*  The rule specifically provides that "[t]he Court may deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." *Id.*

## III.   <u>Factual Contentions</u>

In the 1990s, plaintiff was diagnosed with HCV, a slow-progressive infectious disease affecting the liver.  (Declaration of Carl J. Koenigsmann ("Koenigsmann Decl.") at ¶ 8 (Dkt. No. 210-6);  Declaration of Nancy O'Connor-Ryerson ("Ryerson Decl.") at ¶ 12 (Dkt. No. 210-7)).  HCV causes liver damage to occur over a prolonged period of time, leading to liver failure and death at a "relatively low rate." (Koenigsmann Decl. at ¶¶ 9-10).  The success rate of HCV treatment varies and is dependent upon unique factors such as the "body chemistry of an individual patient, the genotype of the virus, other conditions from which the patient may be suffering, and individual behaviors." (Ryerson Decl. at ¶ 20).  The side effects of HCV treatment can

---

[5]Previously Local Rule 7.1(a)(3).

be significant, and even life-threatening.  (Koenigsmann Decl. at ¶ 15; Ryerson Decl. at ¶ 23).  Treatment must be individualized on a case-by-case basis.  (Koenigsmann Decl. at ¶ 17; Ryerson Decl. at ¶ 25).

From approximately May 2003 until June 2015, plaintiff was confined in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). All of the events relevant to plaintiff's surviving causes of action took place between June 2013 and June 2015, during which time plaintiff was housed intermittently between Auburn C.F. and Southport C.F.  During the time period at issue, DOCCS maintained extensive treatment guidelines and professional oversight with respect to treating inmates diagnosed with HCV.  (Koenigsmann Decl. at ¶¶ 12-19; Ryerson Decl. at ¶¶  19, 23, 25).

### A.    Triple Combination Therapy Treatment

Plaintiff was transferred to Southport C.F. in December 2012, at which time he sought evaluation for HCV treatment.  (SAC at ¶ 40; Ryerson Decl. at ¶ 40).  This was plaintiff's second attempt to treat his HCV while in DOCCS custody – more than a decade earlier plaintiff had undergone, but failed, dual therapy HCV treatment.  (SAC at ¶ 39; Ryerson Decl. at ¶ 29).  The treatment plaintiff pursued at Southport C.F. was "triple combination therapy," approved to reduce viral loads in HCV patients.  (SAC at ¶ 40; Ryerson Decl. at ¶¶ 30-31).  Plaintiff was approved for triple combination therapy at Southport C.F., and commenced the twelve week medical regiment in March 2013.  (SAC at ¶¶ 40-41; Ryerson Decl. at ¶¶ 41-44).

The parties do not dispute that plaintiff "failed" the triple combination therapy

treatment per DOCCS' HCV Guidelines, to the extent that plaintiff's viral loads were not satisfactorily reduced at the end of twelve weeks.  (SAC at ¶ 41; Ryerson Decl. at ¶¶ 43, 45-47, 51-52).  Plaintiff alleges that despite the treatment failure, "the treatment was continued [at Southport C.F.] pursuant to a recommendation by the consulting liver specialist."  (SAC at ¶¶ 41-42; *see also* Affirmation of Nicole Haimson ("Haimson Aff.") (Dkt. No. 210-2) Ex. A ("Pl.'s Dep.") at 30-32).

On or about June 14, 2013, plaintiff was transferred from Southport C.F. to Auburn C.F.  (Ryerson Decl. at ¶ 48).  Plaintiff alleges that he received medication in connection with his triple combination therapy treatment at Southport C.F. on the morning of his departure.  (Pl.'s Dep. at 32).  Upon arrival to Auburn C.F., plaintiff was subjected to a health screening and review of his current medications.  (Ryerson Decl. at ¶¶ 49-50, Ex. E at 99-101 (Dkt. No. 210-12)).  While reviewing plaintiff's HCV treatment history, defendant Nurse Practitioner ("NP") O'Connor-Ryerson noted that plaintiff's viral loads were greater than 1,000 international units per milliliter (IU/mL) after twelve weeks of treatment with triple combination therapy, were not reduced by 2-log[6] from his baseline blood work, and actually increased between weeks eight and twelve, all of which were indicative of treatment failure under DOCCS's HCV treatment guidelines.  (Ryerson Decl. at ¶ 51).

Plaintiff met with NP Ryerson on June 18, 2013.  (SAC at ¶ 44; Ryerson Decl. Ex. E at 103).  He was allegedly informed by NP Ryerson that, upon consulting with

---

[6]A "log" drop in viral load is a 10-fold decrease.  For example, a decrease in viral load from 10,000 to 100 copies could be described as a 2-log decrease.  (Ryerson Decl. at ¶ 27 n. 2).

defendant IFD Nurse Ashley,[7] they had decided to discontinue his triple combination therapy due to the evidence of treatment failure. (SAC at ¶ 44). Plaintiff's ambulatory health record progress notes indicate that he was taken "off meds." (Ryerson Decl. Ex. E at 101, 103). On or about June 21, 2013, defendant DOCCS Chief Medical Officer ("CMO") Koenigsmann notified plaintiff that his HCV treatment had been discontinued "due to failure of treatment." (*Id.* Ex. E at 105).

NP Ryerson does not dispute that plaintiff's triple combination therapy treatment was discontinued at Auburn C.F. Although NP Ryerson has no recollection of doing so, she concedes that upon review of plaintiff's medical records, it would have been her custom and practice to consult with Nurse Ashley. (Ryerson Decl. at ¶¶ 53-54). However, neither she nor Nurse Ashley retained the authority to unilaterally discontinue an inmate's HCV treatment. (*Id.*).

On or about June 27, 2013, plaintiff filed a grievance against NP Ryerson and Nurse Ashley regarding the discontinuation of his triple combination therapy treatment. (Declaration of Rachel Seguin ("Seguin Decl.") (Dkt. No. 210-3) Ex. A at 4; Pl.'s Dep. at 40-41). Plaintiff alleges that the discontinuation of treatment caused his condition to worsen, and his HCV symptoms to return. (SAC at ¶ 45).

**B.    Harvoni Treatment**

In approximately October 2014, the FDA approved the use of the drug Harvoni for treatment of chronic HCV genotype one infections. (Koenigsmann Decl. at ¶ 26).

---

[7]Plaintiff testified that "IFD" is a reference to "infectious disease." (Pl.'s Dep. at 91-92). In the SAC, Nurse Ashley is identified as responsible for coordinating and monitoring the treatment of infectious diseases for the medical department at Auburn C.F. (SAC at ¶ 10).

Harvoni became available for use by DOCCS shortly after it received FDA approval. (*Id.* at ¶ 28-31).

In or around January 2015, plaintiff's primary care was taken over by defendant NP Christa Jeavons. (Ryerson Decl. Ex. F at 33-34) (Dkt. No. 210-13).  On January 20, 2015, plaintiff wrote a letter to NP Jeavons requesting an appointment to discuss Harvoni treatment with her.  (*Id.*).  NP Jeavons responded on January 28th, confirming an appointment was scheduled per plaintiff's request.  (*Id.*).  Plaintiff was also notified several times by defendant Nurse Administrator Coryer that he was scheduled to see NP Jeavons.  (*Id.* at 36, 42, 43, 44).

 NP Jeavons met with plaintiff on or about February 10, 2015.  (*Id.* Ex. F at 54; SAC at ¶ 55; Declaration of Christa Jeavons ("Jeavons Decl.") at ¶ 30 (Dkt. No. 213-1). In addition, plaintiff was seen for sick call at Auburn C.F. on several occasions in January 2015 and the beginning of February 2015.  (Ryerson Decl. Ex. F at 40-41, 53-55). The ambulatory health record progress notes from this period of time indicate that plaintiff appeared in no acute distress and was scheduled for an IFD follow up "soon" relative to his HCV treatment.  (*Id.*). The records also reflect plaintiff's request to be placed on a medical hold at Auburn C.F., and for Harvoni treatment to be started "soon," in light of his upcoming release from DOCCS custody.  (*Id.* Ex. F at 53).

On or about February 13, 2015, plaintiff was transferred from Auburn C.F. to Southport C.F.[8]  There, plaintiff inquired as to the "feasibility" of being placed on a

---

[8]Plaintiff's submission suggests that his transfer was the result of an unrelated disciplinary action.  (Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("Pl.'s Opposition") Ex. H1 (Dkt. No. 223-1 at 10)).

medical hold at Southport C.F., relative to his pending evaluation for HCV treatment. (Ryerson Decl. Ex. F at 65).  Plaintiff was informed that he would not be placed on a medical hold, as he could "continue to receive the medical care [he] need[ed] at any facility[.]" (*Id.* Ex. F at 66, 73).  In March 2015, while still at Southport C.F., plaintiff had laboratory testing performed in connection with his treatment evaluation.  (*Id.* at ¶¶ 69-70; Ex. F at 80-84).

Plaintiff was transferred back to Auburn C.F. on or about March 9, 2015. Throughout March, plaintiff was repeatedly seen by medical staff who noted that he had an upcoming appointment with an IFD consultant.  (*Id.* Ex. F at 75-80).  Plaintiff also underwent a blood test on March 26, 2015, in connection with his treatment evaluation.  (*Id.* at ¶ 74, Ex. F at 81, 127).

On April 6, 2015, plaintiff was seen by an IFD consultant, who opined that plaintiff was a candidate for treatment.  (*Id.* at ¶ 76, Ex. F at 131-32).  On April 16, 2015, NP Jeavons met with plaintiff to discuss the specialist's recommendation, and immediately thereafter submitted an HCV Treatment Consult Request form to CMO Koenigsmann.  (*Id.* at ¶ 66, Ex. F at 95, 101; Koenigsmann Decl. at ¶ 34, Ex. D at 2-4). The next day, CMO Koenigsmann approved plaintiff as a suitable candidate for treatment with Harvoni.  (Koenigsmann Decl. at ¶¶ 36-37, Ex. D at 1).  At the same time, CMO Koenigsmann noted that plaintiff had an early release date in June 2015 (less than twelve weeks later), and therefore required a plan for the continuity of his treatment upon release.  (*Id.* at ¶ 40, Ex. D at 1; Ryerson Decl. Ex. F at 101).

NP Jeavons notified plaintiff that he had been approved for Harvoni on April 20,

10

2015, and would begin treatment that week.  (Ryerson Decl. ¶ 83, Ex. F at 102, 105).

At the same time, DOCCS staff contacted the United States Marshals Service regarding

plaintiff's continuity of care upon transfer into federal custody.  (Koenigsmann Decl.

Ex. D at 5-7; Ryerson Decl. Ex. F at 106-07).  The federal marshals responded that

plaintiff would be traveling to different facilities upon intake, thus it would not be

feasible to maintain his treatment regimen upon initial transfer into federal custody.

(Ryerson Decl. Ex. F at 107).  After learning this information, defendant DOCCS

Regional Medical Director David Dinello, M.D., determined that plaintiff should not

begin treatment prior to his transfer to DOCCS custody, indicating that there was "no

emergent need to rush treatment[,] so it [could] safely wait."  (*Id.*).  This opinion was

shared by defendant Regional Medical Director Susan Mueller, M.D.  (Koenigsmann

Decl. Ex. D at 5).  On April 22, 2015, Plaintiff was notified that his HCV treatment was

no longer commencing at Auburn C.F.  (Ryerson Decl. Ex. F at 103).

     Plaintiff was released into federal custody in June 2015.  In April 2017, plaintiff

began a three-month course of HCV treatment with another drug, Zepatier.  Since

completing this course of treatment, plaintiff's HCV viral loads have remained

undetectable.  (Pl.'s Dep. at 154-55).

     **C.    Property Destruction/Retaliation**

     Plaintiff alleges that when he arrived to Auburn C.F. in June 2013, he requested a

program assignment in the law library by filing an application with the "law library

supervisor," defendant Correctional Officer ("CO") Hesse.  (SAC at ¶ 69). CO Hesse

informed plaintiff that the application would be forwarded to the program committee

chairman ("PCC"), however the PCC later informed plaintiff that he had not received the application. (*Id.*). Plaintiff returned to the law library and filed another application with CO Hesse. (*Id.*). Plaintiff alleges that this "scenario would repeat itself three times[,] with [CO] Hesse stating that the application was forwarded and the PCC stat[ing] that he had not received an application." (*Id.* at ¶ 70). Plaintiff states that he ultimately filed a grievance concerning the situation. (*Id.*). At his deposition, plaintiff testified that CO Hesse used "scare tactics" in an attempt to get plaintiff to withdraw the grievance. (Pl.'s Dep. at 159). Ultimately, the PCC responded that plaintiff's law library application had been forwarded, but plaintiff had to pick another assignment. (SAC at ¶ 70).

CO Hesse allegedly told plaintiff that he "should not have filed the complaint and would never get a law library assignment." (*Id.*). Plaintiff also alleges that, after filing the grievance, CO Hesse verbally harassed him in the law library. (*Id.* at ¶ 71). After exhausting his grievance with DOCCS, Plaintiff filed an Article 78 proceeding in state court regarding the program placement issue. (Pl.'s Dep. at 160-61). Plaintiff claims that after he filed the petition, CO Hesse told him "you don't know when to stop," continued to harass plaintiff with increasing "tone and intensity," and began calling plaintiff derogatory names to other prisoners. (SAC at ¶ 72).

Two years later, in January 2015, plaintiff was transferred to the Auburn C.F. SHU. (Pl.'s Dep. at 165-66; Ryerson Decl. Ex. A at 4 (Dkt. No. 210-8)). Pursuant to DOCCS policy, all inmate personal property entering the SHU must be processed, which included a search for contraband, and an inventory. (Declaration of Rick Gilfus

12

("Gilfus Decl.") at ¶ 6).  According to the plaintiff, three days after his transfer, CO Hesse approached him in the SHU and asked if plaintiff had received his property yet.[9] (Pl.'s Dep. at 164).  Plaintiff answered "No," and CO Hesse responded that he would "personally make sure that the plaintiff would get what he got coming, in an ominous tone."  (SAC at ¶ 73).

Later that morning, plaintiff received his property and discovered that the bags had been opened outside of his presence, and that his legal work had been taken out of their envelopes and thrown into "total disarray."  (SAC at ¶¶ 74-75).  Plaintiff also discovered that documents relative to his active legal cases were missing.  (*Id.* at ¶ 75). It is undisputed that defendant CO Rick Gilfus, the property officer in the SHU where plaintiff was transferred, performed the initial review and search of plaintiff's property. (Pl.'s Dep. at 166; Gilfus Decl. at ¶ 8).  Plaintiff alleges that when he asked about the condition of his property, CO Gilfus replied, "that's what happens when you piss people off in Auburn."  (SAC at ¶ 76).

Plaintiff filed a grievance on or about January 1, 2015, specifically complaining about C.O. Gilfus's alleged tampering with and destruction of his legal documents in retaliation for plaintiff's "filing of a court action against staff here at [Auburn C.F.]." (Declaration of Cheryl Parmiter ("Parmiter Decl.") (Dkt. No. 210-4) Ex. B at 5).

Less than a month later, plaintiff was transferred to Southport C.F.  Upon arrival, plaintiff discovered that his property had not been transported from Auburn C.F. with him, as he states it should have.  (SAC at ¶¶ 78-79).  Plaintiff alleges that his property

---

[9]Plaintiff testified that CO Hesse was in the SHU that day delivering books from the law library.  (Pl.'s Dep. at 164).

did not arrive for another week, and even upon arrival some property was still missing. (*Id.* at ¶¶ 79-80). Plaintiff maintains that CO Gilfus was responsible for the packing and shipping of property belonging to a prisoner transferred out of the Auburn C.F. SHU. (*Id.* at ¶ 80). Plaintiff also alleges that defendant Sergeant ("Sgt.") Donnelly failed to train and supervise CO Gilfus with respect to the handling of his property. (Pl.'s Dep. at 173-74).

The defendants dispute plaintiff's contentions surrounding his retaliation claim. CO Gilfus concedes that, per his duties as a SHU property officer, he removed plaintiff's property from its bags and searched it for contraband upon transfer. He asserts that his actions were in complete compliance with DOCCS directives. (Gilfus Decl. at ¶¶ 2, 6,8-10 (Dkt. No. 210- 14); Haimson Aff. Ex. B at 8). After searching plaintiff's property, CO Gilfus "inventoried it and neatly placed it in several bins for plaintiff's review." (Gilfus Decl. at ¶ 10). Plaintiff was then given the opportunity to review his property, and never complained to CO Gilfus that any of his legal paperwork was missing. (*Id.* at ¶ 12). CO Gilfus also maintains that CO Hesse had no involvement in processing plaintiff's property, nor did CO Gilfus have any communication with CO Hesse about plaintiff or his property. (*Id.* at ¶¶ 13-14). At the time, CO Gilfus was not aware of plaintiff's grievance and/or legal history with CO Hesse. (*Id.* at ¶ 15).

## DISCUSSION

### IV.    <u>Medical Deliberate Indifference</u>

#### A.    **Legal Standards**

In order to state a claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter*, 316 F.3d 178, 183-84 (2d Cir. 2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id.* at 184 (citing *inter alia Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)).

#### 1.    **Objective Element**

There is a two part inquiry to determine whether an alleged deprivation is "objectively serious." *Benjamin v. Pillai,* 794 F. App'x 8, 11 (2d Cir. 2019) (citing *Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006)). The first question is whether the plaintiff was actually deprived of adequate medical care. *Id.* Prison officials who act "reasonably" in response to the inmates health risk will not be found liable under the Eighth Amendment because the official's duty is only to provide "reasonable care." *Salahuddin*, 467 F.3d at 279-80 (citing *Farmer v. Brennan*, 511 U.S. 825, 844-47 (1994)).

The second part of the objective test asks whether the purported inadequacy in the medical care is "sufficiently serious." *Benjamin*, 794 F. App'x at 11 (citing

*Salahuddin*, 467 F.3d at 280).  The court must examine how the care was inadequate and what harm the inadequacy caused or will likely cause the plaintiff.  *Salahuddin*, 467 F.3d at 280 (citing *Helling v. McKinney*, 509 U.S. 25, 32-33 (1993)).  If the "unreasonable care" consists of a failure to provide ***any*** treatment, then the court examines whether the inmate's condition itself is "sufficiently serious."  *Id.* (citing *Smith*, 316 F.3d at 185-86).  However, in cases where the inadequacy is in the medical treatment that was actually afforded to the inmate, the inquiry is narrower.  *Id.*  If the issue is an unreasonable delay or interruption of ongoing treatment, then the "seriousness" inquiry focuses on the challenged delay itself, rather than on the underlying condition alone.  *Benjamin*, 794 F. App'x at 11.  The court in *Benjamin* reiterated that although courts speak of a "serious medical condition" as the basis for a constitutional claim, the seriousness of the condition is only one factor in determining whether the deprivation of adequate medical care is sufficiently serious to establish constitutional liability. *Benjamin*, 794 F. App'x at 11 (citing *Smith*, 316 F.3d at 185).

### 2.     Subjective Element

The second element is subjective and asks whether the official acted with "a sufficiently culpable state of mind." *Benjamin*, 794 F. App'x at 11 (citing *Hathaway v. Coughlin*, 511 U.S. 825, 553 (2d Cir. 1996)).  In order to meet the second element, plaintiff must demonstrate more than a "negligent" failure to provide adequate medical care. *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 835-37).  Instead, plaintiff must show that the defendant was "deliberately indifferent" to that serious medical condition, that the charged official possessed "'a state of mind that is the

equivalent of criminal recklessness.'" *Benjamin,* 794 F. App'x at 11 (quoting *Hathaway*, 99 F.3d at 553).

In order to rise to the level of deliberate indifference, the defendant must have known of and disregarded an excessive risk to the inmate's health or safety. *Abreu v. Lipka,* 778 F. App'x 28, 32 (2d Cir. 2019) (quoting *Smith,* 316 F.3d at 184). The defendant must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he or she must draw that inference. *Chance*, 143 F.3d at 702 (quoting *Farmer*, 511 U.S. at 837). The defendant must be subjectively aware that his or her conduct creates the risk; however, the defendant may introduce proof that he or she knew the underlying facts, but believed that the risk to which the facts gave rise was "insubstantial or non-existent." *Farmer*, 511 U.S. at 844. The court stated in *Salahuddin* that the defendant's belief that his conduct posed no risk of serious harm "need not be sound so long as it is sincere," and "even if objectively unreasonable, a defendant's mental state may be nonculpable." *Salahuddin*, 467 F.3d at 281.

Additionally, a plaintiff's disagreement with prescribed treatment does not rise to the level of a constitutional claim. *Riddick v. Maurer,* 730 F. App'x 34, 38 (2d Cir. 2018) (quoting *Chance*, 143 F.3d at 703). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Sonds v. St. Barnabas Hosp. Correctional Health Services*, 151 F. Supp. 2d 303, 311 (S.D.N.Y. 2001) (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986). Because plaintiff might have

preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds*, 151 F. Supp. 2d at 312 (citing *Estelle v. Gamble*, 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id.; see also Daniels v. Williams*, 474 U.S. 327, 332 (1986) (noting that negligence is not actionable under § 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under § 1983.

### B.    Application

#### 1.    Triple Combination Therapy

Plaintiff claims that NP Ryerson and Nurse Ashley violated his constitutional rights by "summarily discontinuing" his triple combination therapy treatment at Auburn C.F., despite a purported recommendation that he continue treatment. Defendants argue that plaintiff's claim fails for the following reasons: (1) plaintiff had no serious medical need for triple combination therapy treatment, (2) plaintiff's claim amounts to no more than a disagreement over the proper course of treatment, (3) defendants lacked a sufficiently culpable state of mind, and (4) defendants are entitled to qualified immunity. For the following reasons, the court agrees that plaintiff's cause of action with respect to the discontinuance of triple combination therapy should be dismissed.

As to the first prong of deliberate indifference, defendants have established that

plaintiff lacked a serious medical need for triple combination therapy, a treatment for which he was diagnostically considered an unsuitable candidate.  It is undisputed that the continuation of plaintiff's treatment was not medically appropriate under DOCCS's HCV guidelines. These guidelines, based upon national medical standards and recommendations, reflect the various circumstances under which HCV treatment should be suspended and/or considered treatment failure.  For example, the guidelines recommend that a provider consider discontinuing HCV treatment anytime between 12 and 24 weeks in the event a patient has failed to demonstrate at least a two log reduction in viral loads from their baseline blood work.  The guidelines also identify the futility of using triple combination therapy on a patient with a viral load equal to or greater than 1,000 IU/mL after four or twelve weeks of treatment.  Finally, the guidelines specify that for a patient with genotype one virus, such as plaintiff, where the virus is still detectable after 12 weeks, without at least a two log drop in viral loads, treatment should be stopped altogether.  (Ryerson Decl. ¶¶ 37-39).

Plaintiff's laboratory results after twelve weeks of triple combination therapy evidenced treatment failure under each of the aforementioned guidelines.  (*Id.* ¶¶ 43-47, Ex. E at 37, 43, 64, 92).  Plaintiff concedes that the treatment did not satisfactorily reduce his viral loads, and that his blood work evidenced treatment failure under DOCCS guidelines. (SAC at  ¶ 41).  Considering the ineffectiveness of plaintiff's treatment, the slow rate of the disease's progression, and the continued risk inherent in exposing plaintiff to HCV treatment and its accompanying side effects, the court finds that defendants have met their burden and established that plaintiff did not have a

serious medical need for continued triple combination therapy, and that discontinuing plaintiff's treatment was, at the very least, medically appropriate.

Defendants have also established that they did not entertain the requisite state of mind in order to attach liability under the Eighth Amendment. Assuming that NP Ryerson and Nurse Ashley are properly named defendants in this cause of action,[10] the record reflects that neither had reason to believe that the discontinuation of plaintiff's triple combination therapy, as recommended per DOCCS treatment guidelines, would subject him to any serious harm. Admittedly, the courts in this district have identified limited circumstances under which a medical provider may be found to have acted with a sufficiently culpable state of mind, despite following established treatment guidelines. *See, e.g., Johnson v. Wright*, 412 F.3d 398, 404 (2d Cir. 2005) (a jury could reasonably find that the defendants acted with a sufficiently culpable state of mind "by reflexively following the Guideline's substance abuse policy in the face of the unanimous, express, and repeated recommendations of plaintiff's treating physicians . . . to depart from the Guideline and approve [HCV treatment]); *Hatzfeld v. Eagen*, No. 9:08–CV–283 (LES/DRH), 2010 WL 5579883, at * 12-13 (N.D.N.Y. Dec. 10, 2010) (finding question of fact as to whether there was deliberate indifference by the defendants in conditioning plaintiffs HCV treatment on compliance with DOCS policy requiring inmates to first participate in substance abuse treatment program). However, the facts in this case differ dramatically, as the overwhelming objective medical evidence of record indicates that

---

[10]Defendants maintain that the decision to terminate plaintiff's triple combination therapy treatment was made by CMO Koenigsmann, not NP Ryerson or Nurse Ashley. (Ryerson Decl. at ¶ 54).

discontinuing triple combination therapy was the medically appropriate treatment decision.  Unlike the previously cited cases, there is no evidence here that the defendants mechanically relied on other aspects of the DOCCS guidelines that were less clearly correlated with treatment success in making their determination, i.e. plaintiff's participation in an ancillary program.  *See Watson v. Wright,* No. 9:08-CV-62 (NAM/ATB), 2011 WL 4527789, at *10 (N.D.N.Y. Aug. 4, 2011), *report and recommendation adopted*, 2011 WL 4528931 (N.D.N.Y. Sept. 28, 2011) ("To the extent other cases from this Circuit have concluded that application of the DOCS HCV Guidelines could constitute an Eighth Amendment violation, they have addressed reflexive or mechanical reliance on other aspects of the [guidelines] that are less clearly correlated with treatment success.").

Here, the record reflects that the medical staff's determination to discontinue treatment was appropriately and objectively rendered.  NP Ryerson evaluated plaintiff's blood work and medical records upon transfer, and personally met with plaintiff.  Her evaluation of the medical data revealed that plaintiff's twelve weeks of treatment with triple combination therapy at Southport C.F. had failed.  Considering the evidence submitted by the moving parties, the defendants have shown that plaintiff's serious medical needs were not recklessly ignored, and the decision to discontinue his treatment was supported by legitimate reasons.  *See Jackson v. Sheehan*, No. 16-CV-6710, 2021 WL 795313, at *8 (W.D.N.Y. Mar. 2, 2021) (summary judgment appropriate where denial of HCV triple drug therapy was "supported by legitimate reasons") (quoting *Brown v. Cade*, 698 F. App'x 33, 34 (2d Cir. 2017)).

21

Plaintiff has failed to raise a question of fact in order to defeat summary judgment on this issue. Even accepting plaintiff's argument that there were differing opinions between plaintiff's prior medical provider at Southport C.F. and Auburn C.F. as to whether his HCV treatment should proceed,[11] "the law is clear that a difference of opinion . . . even among medical professionals themselves, as to the appropriate course of medical treatment does not in and of itself amount to deliberate indifference." *Williams v. M.C.C. Institution*, 97 Civ. 5352, 1999 WL 179604, at *7 (S.D.N.Y. Mar. 31, 1999) (citing, *inter alia, Ross v. Kelly*, 784 F. Supp. 35, 45 (Feb. 5, 1992)); *see also Gillespie v. New York State Dept. of Correctional Services*, 9:08–CV–1339 (TJM/ATB), 2010 WL 1006634, at *6, (N.D.N.Y. Feb. 22, 2010) (the fact that other physicians may have previously followed a different course of treatment does not render the actions of the prison doctor "deliberate indifference"), *report and recommendation adopted*, 2010 WL 1006643 (N.D.N.Y. Mar 19, 2010).

Plaintiff's allegations do not create a material issue of fact supporting his claim that NP Ryerson and/or Nurse Ashley provided unreasonable care or acted with deliberate indifference to his medical needs. Accordingly, this court recommends that defendants' summary judgment motion be granted as to this cause of action.

## 2. Harvoni Treatment

Plaintiff alleges that defendants Koenigsmann, Mueller, Dinello, Jones, Jeavons,

---

[11]There is some evidence supporting plaintiff's contention that his HCV treatment was extended beyond the initial twelve week period, to the extent that the record documents treatment at Southport C.F. extending into weeks thirteen and fourteen. However, plaintiff has not identified a specific recommendation from any treatment provider, or consulting specialist, indicating that he should continue the triple combination therapy, or why, despite the initial treatment failure.

Coryer, Ryerson, Ashley, and Gardner[12] violated his constitutional rights by delaying the evaluation for, and ultimately denying treatment with, the HCV drug Harvoni.  The defendants argue that this cause of action should be dismissed on summary judgment because (1) plaintiff has failed to establish the personal involvement of several defendants, (2) plaintiff had no serious medical need for treatment with Harvoni, (3) plaintiff's claim amounts to no more than a disagreement over the proper course of treatment, (4) plaintiff has not demonstrated the defendants' culpable state of mind, and (5) defendants are entitled to qualified immunity.  For the following reasons, the court agrees that plaintiff's deliberate indifference claim should be dismissed.

Plaintiff's cause of action relative to Harvoni treatment is more properly addressed as two individual claims of deliberate indifference.  To the extent plaintiff challenges an alleged *delay* in his evaluation for treatment, where an inmate alleges a delay in treatment—rather than an absolute denial of treatment—"it is appropriate to focus on the challenged delay . . . in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious' to support an Eighth Amendment claim." *Ray v. Zamilus*, No. 13 Civ. 2201, 2017 WL 4329722, at *9 (S.D.N.Y. Sept. 27, 2017) (quoting *Smith*, 316 F.3d at 184).  "[T]he case law clearly establishes that the delay in treatment does not become a constitutional violation merely because the underlying medical condition,

---

[12]The Wilson Elser defendants have also moved to dismiss this medical indifference claim on behalf of defendant Sgt. Donnelly, however the SAC does not allege Sgt. Donnelly's culpability with respect to this cause of action.  (SAC at ¶ 85). Plaintiff specifically testified that Sgt. Donnelly did not "hold any responsibly in the deliberate indifference claims," and the claims against him were limited to the retaliation claim, as further discussed below.  (Pl.'s Dep. at 173-74).

here, Hepatitis C, is indisputably a serious one." *DiChiara v. Wright*, No. 06-CV-6123, 2011 WL 1303867, at *7 (E.D.N.Y. Mar. 31, 2011).  "A defendant's delay in treating an ordinarily insignificant medical condition can become a constitutional violation if the condition worsens and creates a substantial risk of injury.  Conversely, delay in treating a life-threatening condition may not violate the Eighth Amendment if the lapse does not cause any further harm beyond that which would occur even with complete medical attention." *Graham v. Wright*, No. 01 Civ. 9613, 2004 WL 1794503, at *4 (S.D.N.Y. Aug. 9, 2004) (quotations omitted) (citing *Smith*, 316 F.3d at 186).[13]

Furthermore, the court is reminded that "a prisoner is not entitled to the best [including the most efficient] healthcare possible[,] or even to a choice among available treatment modalities; instead, the Constitution entitles a prisoner only to reasonable measures to meet a substantial risk of serious harm."  *Diachiara v. Pataki*, No. 106-CV-6123, 2007 WL 749742, at *3 (E.D.N.Y. Mar. 7, 2007) (alterations not in original) (citing *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997)); *see also Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986) ("The Constitution does not command that inmates be given medical attention that judges would wish to have for themselves.").  A delay in medical treatment does not always necessarily invoke the Eighth Amendment, and the Second Circuit has reserved such a classification for when "officials deliberately

---

[13] "Although the Second Circuit has never required plaintiffs alleging a denial of adequate medical care in a Section 1983 action to produce expert medical testimony . . . multiple district courts in this Circuit, and at least four Circuit courts, have concluded that a plaintiff who complains that a delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment." *Ray v. Zamilus*, No. 13 Civ. 2201, 2017 WL 4329722, at *10 (S.D.N.Y. Sept. 27, 2017) (internal citation and quotations omitted) (listing cases).

delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years." *Sims v. City of New York*, 788 F. App'x 62, 64 (2d Cir. 2019) (quoting *inter alia Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999)); *see also Hathaway v. Coughlin*, 841 F.2d 48, 50-51 (2d Cir. 1988) (officials delayed arranging corrective hip surgery for over two years); *Archer v. Dutcher*, 733 F.2d 14, 16-17 (2d Cir. 1984) (officials deliberately delayed care as form of punishment for violations of discipline code or other invalid reasons).

Considering the aforementioned, this court does not find that the less than four-month period between plaintiff communicating to NP Jeavons his request for treatment evaluation, and CMO Koenigsmann's approval of said treatment, constituted a cognizable delay in care under the Eighth Amendment. Notably, plaintiff consulted with an IFD consultant in August 2014 and voluntarily postponed his HCV treatment in light of Harvoni's[14] anticipated approval for use by the FDA. (Ryerson Ex. F at 18). The IFD consultant apparently approved of this plan, noting that plaintiff "feels well, [with] some fatigue. Reports chronic itch." (*Id.*). It was recommended that plaintiff follow up in three months. (*Id.*). Harvoni attained FDA approval in October 2014, and became available as an HCV treatment in DOCCS facilities by November 2014. (Koenigsmann Decl. at ¶¶ 26-31).

The record otherwise reflects that plaintiff was being evaluated for treatment

---

[14]Harvoni was the first combination pill approved to treat chronic HCV genotype one infections. (Koenigsmann Decl. at ¶ 26). Studies indicated that there was a "high cure rate for treatment-experienced cirrhotic patients with genotype 1 with the use of Harvoni[.]" (*Id.* at ¶ 27, Ex. A).

during the subsequent period in question.  After plaintiff wrote to NP Jeavons in

January[15] 2015 requesting an appointment "to discuss [his] treatment with the new Hep

C drug, Harvoni," NP Jeavons responded that she had scheduled an appointment, and

subsequently met with plaintiff at the beginning of February 2015 to discuss his

treatment plan.  (Ryerson Decl. Ex. F at 33, 54).  Although plaintiff was transferred to a

different facility soon thereafter, he still presented for the requisite laboratory testing

relative to his treatment evaluation.  (Ryerson Decl. ¶¶ 69-70, Ex. F at 80-84).  Plaintiff

was transferred back to Auburn C.F. on March 9, 2015, where he underwent further pre-

treatment testing.  (*Id.* ¶ 74, Ex. F at 81, 127).  It appears that there was a waiting period

for some of the test results, before plaintiff could proceed with the evaluation process.

(*Id.* Ex. F at 78, 80, 90, 94).  In February, plaintiff met with the IFD consultant and in

April, upon review of the consultant's recommendation and after meeting with plaintiff,

NP Jeavon's submitted a consult request form to CMO Koenigsmann for treatment

approval.  CMO Koenigsmann approved plaintiff for treatment with Harvoni the

following day.  (Ryerson Decl. Ex. F at 101).  On these facts, no reasonable trier of fact

could conclude that plaintiff's treatment evaluation was delayed to the extent of an

Eighth Amendment violation.

　　　　Plaintiff's contention that his transfer from Auburn C.F. to Southport C.F., then

back to Auburn C.F. a month later, delayed his treatment to an actionable extent is

unpersuasive.  In support of his position that he was improperly denied a medical hold at

---

[15]Plaintiff's correspondence indicates that, as of January 2015, NP Jeavons had recently taken on the role of his primary care provider.  (Ryerson Decl. Ex. F at 34).  Plaintiff testified that his prior provider, Dr. Weinstock, retired sometime in the fall of 2014, after which "everything went downhill."  (Pl.'s Dep. at 40, 59, 127).

both facilities, plaintiff has submitted what he purports to be an excerpt from the DOCCS "medical hold policy," dated March 29, 2011, which states that an HCV patient will remain on facility medical hold if the patient "is undergoing an initial work up for treatment consideration under the auspices of a specialist."  (Pl.'s Opposition Ex. K). Plaintiff, however, was not undergoing an initial work up for HCV treatment consideration until years later, by which time it appears the relevant policy only required a facility medical hold for "patients undergoing treatment for [HCV] . . . during the first five weeks of therapy."  (Ryerson Decl. Ex. C at 13, Ex. D at 15).  In any event, the record reflects that denying plaintiff a medical hold did not prevent DOCCS from proceeding with plaintiff's initial work up for HCV treatment at both facilities, although, perhaps, not as quickly as plaintiff preferred.

Furthermore, plaintiff has not introduced any verifying medical evidence that his HCV worsened as a result of the alleged delay in treatment, or that the 'delay' presented a risk that the eventual treatment would be less effective.  Plaintiff's medical records between December 2014 and April 2015 do not suggest that he was suffering from any significant exacerbation of HCV symptoms, and plaintiff has not advanced any evidence contradicting Dr. Dinello, Dr. Mueller, and CMO Koenigsmann's collective opinion that plaintiff's condition was stable, and there was no urgent need to rush treatment.[16] Moreover, the undisputed evidence shows that once plaintiff received treatment in

---

[16]Plaintiff alleges that he suffered night sweats, fatigue, nausea and itching during this period; however these unsupported, subjective allegations are generally unsupported by the record and thus are insufficient to give rise to a genuine issue of fact concerning the objective element. *See Bilal v. White*, 494 F. App'x at 146 (Plaintiff's "mere recitation of the formula that he suffered 'extreme pain' is insufficient to raise an issue of fact as to whether the delay of the pain medication was sufficiently serious to rise to the level of [a constitutional] violation.").

federal custody, the virus was eradicated and remains so. Accordingly, plaintiff has not raised a genuine issue regarding the objective prong of this claim, as there is no evidence that the purported delay in treatment approval was "substantially serious." *See Motta v. Wright,* No. 9:06-CV-1047(NAM/GJD), 2009 WL 1437589, at *16 (N.D.N.Y. May 20, 2009) (finding alleged three-and-a-half year delay in HCV treatment did not satisfy objective factor of Eighth Amendment analysis where defendants presented evidence that delay was not "substantially serious," including evidence of the slow progression of HCV and the minimal effect of the delay on plaintiff's condition).

Even assuming that the alleged delay in evaluating plaintiff for HCV treatment caused him objective harm, plaintiff has not come forward with evidence satisfying the mental prong of his Eighth Amendment medical indifference claim, i.e. evidence raising a material issue of fact as to whether any of the named defendants acted with deliberate indifference to his medical needs. Although plaintiff was aggressively pursuing treatment, and frequently communicated his requests to various facility staff between December 2014 and April 2015, the record does not indicate that the defendants ignored, or left untreated, any complaints of acute pain or symptom exacerbation relative to plaintiff's HCV during this time. Nor does the record reflect that the defendants were turning a blind eye to plaintiff's HCV condition. As previously noted, plaintiff was being followed for an initial work-up relative to Harvoni treatment at both Auburn C.F. and Southport C.F., and seen in sick call on a regular basis. At its core, plaintiff's claim is that his evaluation for Harvoni treatment and follow-up consultation with the IFD consultant did not occur fast enough. Nevertheless, on the facts herein his

dissatisfaction does not amount to deliberate indifference. *See Coke v. Medical, Dep't of Corr. & Cmty. Supervision*, No. 17 Civ. 0866, 2018 WL 2041388, at *5 (S.D.N.Y. Apr. 30, 2018) (no deliberate indifference for alleged 13-month delay of referral to pain management where plaintiff was being treated and evaluated during the period in question, and ultimately was seen by a pain specialist); *Patterson v. Quiros*, No. 3:19-CV-147, 2021 WL 681144, at *10 (D. Conn. Feb. 22, 2021) ("Disagreements over medications, diagnostic techniques, forms of treatment, *the need for specialists, or the timing of their intervention* are not generally adequate grounds for an Eighth Amendment claim[.]") (emphasis added) (citations omitted).  Because plaintiff has failed to raise a material question of fact suggesting that any of the defendants deliberately delayed medical care to punish him, or ignored any complaints of worsening symptoms, his claim that defendants delayed approving him for Harvoni treatment is insufficient to satisfy the deliberate indifference standard. *See Pabon v. Wright,* No. 99 Civ. 2196, 2004 WL 628784, at *8 (S.D.N.Y. Mar. 29, 2004), *aff'd*, 459 F.3d 241 (2d Cir. 2006) (evidence as to minimal delays in defendant's treatment of Hepatitis C suggests at most several acts of negligence, insufficient to support an Eighth Amendment violation).

The second component of plaintiff's Eighth Amendment claim alleges that the defendants were deliberately indifferent to his medical needs when they declined to treat him with Harvoni at Auburn C.F., despite CMO Koenigsmann's initial approval. Although plaintiff has named a plethora of defendants in this claim, it is clear that they were not all personally involved in the decision to withhold treatment in April 2015, and

to this end may not be held liable for the alleged constitutional violation.  The Second Circuit recently clarified the standard for personal involvement of individuals in a § 1983 action.  *See Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020).  Pursuant to the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit in *Tangreti* made clear that in order to attach liability to an individual, regardless of supervisory status, a plaintiff must

> plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 . . . . "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id*. The violation must be established against the supervisory official directly.

*Id.* (quoting *Iqbal*, 556 U.S. at 676).  Quoting a Tenth Circuit case, the *Tangreti* court stated that "'after *Iqbal*, [a p]laintiff can no longer succeed on a § 1983 claim against [a d]efendant by showing that as a supervisor he behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of his subordinates, *unless that is the same state of mind required for the constitutional deprivation he alleges*.'" *Id.* (alterations in original) (quoting *Dodds v. Richardson*, 614 F.3d 1185, 1204 (10ᵗʰ Cir. 2010) (internal quotation marks omitted) (emphasis added, other citations omitted).  The supervisor must have committed the violation him or herself, not by the supervision of others who committed the violation. *Id.*  Likewise, the supervisor must personally display the requisite state of mind, depending on the violation at issue. *Id.*

Here, the alleged violation at issue was withholding HCV treatment in April 2015. Because it is undisputed that non-medical supervisory officials Deputy Superintendent

Jones and Acting Deputy Superintendent Gardner had no medical background or training, no authority with respect to plaintiff's medical care and treatment, and no reason to distrust the competence of the medical staff charged with treating plaintiff, plaintiff has not sufficiently established their personal involvement in order to withstand summary judgment. *See Jackson v. Sheehan*, No. 16-CV-6710, 2021 WL 795313, at *5 (W.D.N.Y. Mar. 2, 2021) ("[S]upervisory officials are generally permitted to rely on the opinions of medical staff concerning the correct course of treatment."); *Battle v. Recktenwald*, No. 14-CV-2738, 2016 WL 698145, at *11 (S.D.N.Y. Feb. 19, 2016).

Plaintiff also attempts to attach liability to Auburn C.F. medical defendants NP Ryerson, Nurse Administrator Coryer, Nurse Ashley, and NP Jeavons. The record, however, is devoid of any evidence that these defendants had the authority to revoke and/or reinstate plaintiff's Harvoni treatment once approved by CMO Koenigsmann. In fact, to the extent NP Jeavons submitted plaintiff's Harvoni treatment application and acquired approval from her supervisor, it appears that she performed her function with respect to plaintiff's complaint to the limit of her position, and there is no evidence suggesting that NP Jeavons or any other Auburn C.F. medical staff had the authority to deviate from the subsequent decision to withhold treatment made by DOCCS central office staff. *Jackson v. Sheehan*, 2021 WL 795313, at *7 (no genuine issue of material fact regarding personal involvement where defendants, "having performed their functions with respect to plaintiff's complaint to the limits of their authority, 'had no further responsibility to resolve it.'") (quoting *Tangreti,* 983 F.3d at 620 n. 7).

Based on the record before this court, the only defendants who could plausibly be

held liable for the decision to withhold the approved treatment in April 2015 were CMO

Koenigsmann and DOCCS Regional Medical Directors Mueller and Dinello.

Notwithstanding these defendants' personal involvement, however, plaintiff has failed

to raise a material question of fact as to whether the determination not to treat plaintiff at

Auburn C.F. constituted a violation of his constitutional rights.  As previously

discussed, plaintiff has failed to show that his condition was such that he faced a

substantial risk of serious harm if untreated, much less that his infection was causing

him to experience any serious symptoms or ill effects.  The overwhelming evidence has

established plaintiff's voluntary decision to delay treatment, the absence of any

exacerbated HCV symptoms during the period in question, and a lack of proof refuting

Dr. Dinello's professional opinion, as concurred with by Dr. Mueller and CMO

Koenigsmann, that there was "no emergent need to rush treatment," and it could "safely

wait" to commence until plaintiff was in federal custody.  (Ryerson Decl. Ex. F at 107;

Koenigsmann Decl. at ¶¶ 43-46, Ex. D at 5).

        Plaintiff has also failed to raise a material question of fact with respect to the

mental prong of his deliberate indifference claim, as the record would not permit a

reasonable trier of fact to find that these defendants knew of and disregarded an

excessive risk to plaintiff's health when they chose to defer plaintiff's treatment.  After

CMO Koenigsmann approved treatment, DOCCS staff commenced establishing a

continuity of care plan for when plaintiff was transferred into federal custody.  (Ryerson

Decl. Ex. F at 102, 107-08).  It eventually became clear that the federal marshals would

be unable to maintain plaintiff's proposed treatment regimen immediately upon transfer.

However, there is no indication that the defendants previously knew, or had reason to know, that plaintiff would not be able to continue his treatment regimen upon transfer into federal custody. (Koenigsmann Decl. at ¶¶ 42, 47). Moreover, the defendants had no authority over the federal Bureau of Prisons' ("BOP") provision of care to plaintiff, including treatment determinations. Thus, the defendants were left with the option to either commence a treatment regimen they knew would be discontinued short of completion, and take on the risks involved therein; or to defer treatment and transfer plaintiff's medical information to the BOP, with the understanding that the federal government also provided HCV treatment to eligible inmates in its custody. (Koenigsmann Decl. at ¶¶ 44, 47). The evidence reflects that the defendants chose the former based on their professional medical opinion and in consideration of the risks to plaintiff's health. In the absence of any evidence plausibly suggesting an otherwise invalid reason for denying plaintiff treatment under these circumstances, plaintiff has failed to raise a material question of fact as to the mental prong of his deliberate indifference claim. *See Williams v. Sykes*, No. 9:17-CV-990(TJM/ATB), 2019 WL 2374116, at *5 (N.D.N.Y. May 10, 2019), *report and recommendation adopted*, 2019 WL 2369882 (N.D.N.Y. June 5, 2019) (granting summary judgment where there was "simply no evidence that [defendant] intentionally deprived plaintiff of adequate medical care," nor evidence support a finding that the defendant "acted recklessly and 'knew or should have known' that her acts or omissions 'posed an excessive risk to [plaintiff's] health or safety.'" ) (citations omitted); *Padilla v. Bobb-Diallo*, No. 9:17-CV-1150 (MAD/TWD), 2020 WL 3038135, at *9 (N.D.N.Y. Jan. 13, 2020), *report and*

*recommendation adopted*, 2020 WL 1025159 (N.D.N.Y. Mar. 3, 2020) (plaintiff did not meet the requirements of the *mens rea* prong where there was no evidence of 'conscious delay' or failure to treat an inmate's serious medical condition 'as punishment for other invalid reasons') (citations omitted).

## V.    Retaliation

### A.    Legal Standards

To state a First Amendment claim of retaliation, an inmate must allege facts plausibly suggesting that (1) the speech or conduct at issue was protected, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected conduct and the adverse action. *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014)(citations omitted).  The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration."  *Faulk v. Fisher*, 545 F. App'x 56, 58 (2d Cir. 2013) (quoting *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003)).  In other words, we must examine prisoners' claims of retaliation with "skepticism and particular care."  *Rivera v. Goord*, 119 F. Supp 2d 327, 339 (S.D.N.Y. 2000) (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995), *abrogated on other grounds, Tangreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020)).  Accordingly, a First Amendment retaliation claim must be supported by "specific and detailed factual allegations," and not stated in "wholly conclusory terms."  *Dolan v. Connolly,* 794 F.3d 290, 295 (2d. Cir. 2015) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.1983), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 (2002)).

In order to satisfy the final prong, "the causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Cruz v. Grosso,* No. 9:13-CV-30 (FJS/TWD), 2014 WL 2176256, at *6 (N.D.N.Y. May 23, 2014) (citing *inter alia Colon,* 58 F.3d at 873). Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, including temporal proximity between the protected activity and the alleged retaliatory act, and statements by the defendant concerning his or her motivation.[17] *Cruz,* 2014 WL 2176256, at *6 (citing *Colon*, 58 F.3d at 872-73). However, temporal proximity alone is not enough to establish a causal connection. The Second Circuit has held that where "timing is the only basis for a claim of retaliation . . . an inference of retaliation does not arise." *Thomas v. Waugh,* No. 9:13-CV-0321 (MAD/TWD), 2015 WL 5750945, at *15 (N.D.N.Y. Sept. 30, 2015) (quoting *Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87, 95 (2d Cir. 2001).

### B.    Application

#### 1.    Defendants Ashley, Ryerson and Jeavons

Plaintiff alleges that Nurse Ashley, NP Ryerson, and NP Jeavons intentionally delayed plaintiff's evaluation for Harvoni treatment in retaliation for plaintiff filing a grievance against Ashley and Ryerson concerning the discontinuation of his triple combination therapy in 2013. Nurse Ashley and NP Ryerson argue that the retaliation claim should be dismissed as against them, because plaintiff has failed to sufficiently identify any adverse action attributable to them. They also argue that plaintiff has failed

---

[17] This court recognizes the existence of other factors, as discussed in *Colon,* applicable only when the alleged adverse action is the issuance of a misbehavior report.

to establish a causal connection between any protected speech and the alleged actions of NP Ryerson and Nurse Ashley. Along with similar arguments, NP Jeavons also contends that plaintiff has failed to exhaust his administrative remedies with respect to this claim – an argument disputed by both plaintiff and the Wilson Elser defendants.

Assuming, without deciding, that plaintiff has sufficiently exhausted his administrative remedies concerning the underlying grievance, the court considers whether plaintiff has raised a question of material fact as to the elements of his retaliation claim. To begin, it is well settled that the filing of a grievance is constitutionally protected activity in the context of retaliation, thus plaintiff has presented sufficient evidence that his 2013 grievance regarding the discontinuation of triple combination therapy constituted protected speech. *See Flynn v. Ward,* No. 15-CV-1028 (TJM/CFH), 2018 WL 3195095, at *8 (N.D.N.Y. June 7, 2018) ("It is well-settled that the filing of a grievance constitutes protected speech under the First Amendment" for purposes of a retaliation claim) (citing *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996)).

Plaintiff's protected conduct notwithstanding, he has failed to raise a triable issue of material fact as to the remaining elements of his retaliation claim, and dismissal is warranted. Plaintiff has failed to produce sufficient evidence identifying any discernable, adverse actions taken against him by the defendants. Although the courts in this district have found that "denial of medical evaluation, treatment, and adequate pain medication can suffice to establish adverse action under a First Amendment retaliation analysis[,]" *Abreu v. Farley,* No. 6:11-CV-06251, 2019 WL 1230778, at *22 (W.D.N.Y.

Mar. 15, 2019), in the context of a summary judgment motion "a pro se party's bald assertion, unsupported by evidence, is not sufficient[,]" and the plaintiff must present some evidence suggesting that the defendants took adverse action against him. *Cole v. Artuz*, No. 93 Civ. 5981, 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)) (internal quotations and citations omitted).

Plaintiff alleges, generally, that NP Ryerson, Nurse Ashley, and NP Jeavons intentionally delayed the process by which he was evaluated for treatment at Auburn C.F.  Defendants, however, have produced evidence indicating that between January and April 2015, plaintiff's request for treatment was acknowledged by NP Jeavons and other DOCCS medical staff, and plaintiff underwent various tests in connection with his treatment evaluation.  NP Jeavons met with him while managing his initial work-up for treatment, and also scheduled plaintiff for a consultation with IFD.  (Ryerson Decl. Ex. F at 127, 131-32).  With respect to Nurse Ashley, the record indicates that she met with plaintiff on January 20, 2015 and discussed the status of his HCV treatment.  (*Id.* Ex. F at 41).  She referred plaintiff's requests regarding treatment to his primary care provider, and soon thereafter NP Jeavons communicated to plaintiff that he was scheduled to see her for further discussion.  Plaintiff also met with Nurse Ashley on several occasions after he was transferred back to Auburn C.F., for the purpose of executing paperwork relevant to his pending HCV treatment.  (*Id.* Ex. F at 69, 79, 81, 99).  Upon CMO Koenigsmann's approval, Nurse Ashley commenced inquiry into a continuity of care plan for plaintiff upon transfer to federal custody. (*Id.* Ex. F at 106-08).  NP Ryerson has affirmed that she had no personal involvement in handling plaintiff's request for HCV

treatment with Harvoni or evaluating plaintiff for treatment with the same.  (Ryerson Decl. at ¶ 91).  In light of the aforementioned evidence suggesting the absence of any adverse actions on the part of defendants, plaintiff's conclusory, unsupported allegations of adverse action fail to create a question of fact for purposes of summary judgment. *See Hare v. Hayden*, No. 09 Civ. 3135, 2011 WL 1453789, at *3 (S.D.N.Y. Apr. 14, 2011) ("Conclusory allegations of retaliation are not sufficient . . . .") (citation omitted).

Even if plaintiff had established a material question of fact as to the defendant's alleged adverse action, the court finds that no reasonable jury would conclude there was an adequate causal connection between plaintiff's 2013 grievance and the circumstances surrounding his evaluation for Harvoni treatment.  Plaintiff filed a grievance against defendants Ryerson and Ashley on or about June 27, 2013, complaining about the discontinuance of his triple combination therapy.  The adverse action alleged by plaintiff did not take place until well over a year later.  This time period is longer than courts in this circuit find sufficient for an inference of retaliation.  *See Chang v. Safe Horizons*, 254 Fed. App'x 838, 839 (2d Cir. 2007) (the adverse act occurred "one year after her complaint for discrimination, thus undermining any causal nexus based on temporal proximity"); *Burkybile v. Bd. of Educ.*, 411 F.3d 306, 314 (2d Cir. 2005) (finding no causal connection when "more than a year passed" between the protected speech and the adverse action).  In the absence of any circumstantial or direct evidence otherwise plausibly suggesting a retaliatory animus by the defendants, plaintiff's allegations of retaliation are "mere conclusory allegations" that "cannot by themselves create a genuine issue of material fact" to overcome summary judgment.  *Richards-Byers v. New*

*York City Dep't of Fin.*, 449 F. App'x 55, 57 (2d Cir. 2011) (citation omitted).

   This is especially true when considering NP Jeavons alleged culpability, in light of the fact that she was not named in, and had no involvement with, the circumstances underlying plaintiff's 2013 grievance.   In this circuit, courts have regularly dismissed claims that a defendant has retaliated for complaints against a third party.  *See, e.g., Hare v. Hayden*, 09 Civ. 3135, 2011 WL 1453789, at *4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant." (citing *Wright v. Goord*, 554 F.3d 255, 274 (2d Cir. 2009)) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer); *Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 369 (S.D.N.Y. May 24, 2011) (plaintiff failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in).  Here, plaintiff provides no basis for NP Jeavons's alleged retaliation for the 2013 grievance against Ryerson and Ashley, other than his unsubstantiated testimony that NP Jeavons "hated him," and "likely" discussed plaintiff's 2013 grievance with Ryerson in conjunction with his subsequent complaints. (Pl.'s Dep. at 125-27).[18]  Nevertheless, plaintiff admits that he did not meet

------

   [18]Although not clearly alleged, plaintiff at one point appears to suggest that NP Jeavons delayed his evaluation for treatment in retaliation for the contemporaneous grievances he filed against her regarding said delay. This allegation is patently meritless.  By the time plaintiff filed his February 19, 2015 grievance, plaintiff and his medical care had already been transferred into the custody of Southport C.F.  Plaintiff was transported back to Auburn C.F. on or about March 9, 2015.  A little over a month later, plaintiff had completed his initial work-up for treatment under the care of NP Jeavons, who during that time submitted a request for approval by CMO Koenigsmann. On these undisputed facts, no reasonable juror could conclude that NP Jeavons was delaying plaintiff's treatment evaluation between the time plaintiff returned to Auburn C.F. and when he became approved for treatment.

NP Jeavons before 2015. (*Id.* at 127). Given the absence of any facts plausibly suggesting that NP Jeavons was aware of plaintiff's prior grievance regarding triple combination therapy, or retaliated against him because of it, plaintiff's First Amendment retaliation claim is may not withstand summary judgment.

### 2.    Defendants Hesse, Gilfus, and Donnelly

Plaintiff's last surviving cause of action alleges that in January 2015, CO Gilfus, CO Hesse, and Sgt. Donnelly acted together to destroy plaintiff's legal documents and leave his property in disarray, in retaliation for plaintiff filing a grievance and court proceeding against CO Hesse regarding plaintiff's efforts to attain a program assignment in the law library. (SAC at ¶¶17-20, 69-87; Haimson Aff. Ex. A at 173-75). Defendants argue that, because plaintiff failed to exhaust his administrative remedies with respect to this claim, it should be dismissed. Alternatively, defendants argue that plaintiff's retaliation claim fails against defendant Donnelly for lack of personal involvement, and against Gilfus and Donnelly for failure to establish a causal connection between any protected speech and their alleged adverse actions. The court agrees that plaintiff failed to exhaust his administrative remedies with respect to this retaliation claim, and plaintiff's cause of action should be dismissed accordingly.

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004),

*abrogated on other grounds by Ross v. Blake,* 380 F. 3d. 670 (2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. 199, 218-19 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford,* 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id*. § 701.8. Complaints of harassment are handled by an expedited

procedure which provides that such grievances are forwarded directly to the Superintendent of the facility, after which the inmate must appeal any negative determination to the CORC. *Id.* §§ 701.8(h) & (i), 701.5.

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, __ U.S. __, 136 S. Ct. 1850, 1857 (June 6, 2016). "'[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.'" *Riles v. Buchanan*, 656 F. App'x 577, 580 (2d Cir. 2016) (quoting *Ross*, __ U.S. at __, 136 S. Ct. at 1857). Although *Ross* has eliminated the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, __ U.S. at __, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to

the inmate. *Id; see also Riles*, 2016 WL 4572321 at *2.

Here, the record reflects that on or about January 19, 2015 plaintiff filed grievance AUB-6602-15, alleging that his property was tampered with and his legal documents destroyed upon transfer to the SHU in retaliation for his "filing of a court action against staff here at Auburn." (Declaration of Cheryl Parmiter ("Parmiter Decl.") Ex. B at 5). The grievance was investigated by non-party Sgt. Murray on January 20, 2015, and three days later the IGRC granted plaintiff's grievance, to the extent that plaintiff was advised to file a claim if he was missing any property. (*Id.* Ex. B at 3, 6). Plaintiff appealed the grievance at the Superintendent level on January 26, 2015, and on January 28th Acting Superintendent Robinson agreed with the IGRC's findings and advised plaintiff to file a claim if he was missing any property. (*Id.* Ex. B at 2).

Plaintiff admits that grievance AUB-6602-15 was never processed beyond the Superintendent level. (Pl.'s Dep. at 82). At his deposition, plaintiff testified that "for some reason [it] came up missing[.]" (*Id.*). Nevertheless, plaintiff has not produced any proof that an appeal to CORC actually existed. The record reflects that Auburn C.F. and Southport C.F., the two facilities in which plaintiff was housed in 2015, had fully functioning inmate grievance processes. (Declaration of Rachel Seguin ("Seguin Decl.") at ¶ 13, Parmiter Decl. at ¶ 10). The evidence further indicates that plaintiff utilized the grievance process on various other occasions in 2015, including the appeal of three other grievances to CORC after January 2015. (Seguin Decl. at ¶ 14, Ex. A; Parmiter Decl. ¶¶ 18-19, Ex. A at 1). Plaintiff testified that he continued to receive

43

CORC determinations even after his release into federal custody in June 2015.[19]  (Pl.'s Dep. at 142-43).

As previously discussed, the only basis on which the court may excuse plaintiff's undisputed failure to exhaust his administrative remedies is the unavailability of those remedies.  In this case, plaintiff's unsupported, general testimony that grievance AUB-6602-15 was "lost" in the appeals process is insufficient to establish a genuine issue of material fact as to the availability of the inmate grievance process to plaintiff.[20]  *See Davis v. Grant,* No. 15-CV-5359, 2019 WL 498277, at *10 (S.D.N.Y. Feb. 8, 2019) (plaintiff's statements that his grievance was lost or destroyed, which stood alone and unsupported, did not warrant exception to exhaustion requirement); *Engles v. Jones*, No. 13-CV-6461, 2018 WL 6832085, at *10 (W.D.N.Y. Dec. 28, 2018) (granting summary judgment to defendants for failure to exhaust where there was no record of plaintiff filing his grievance and plaintiff merely alleged without any documentary support that his grievance was lost or destroyed); *Scott v. Kastner-Smith*, 298 F. Supp. 3d 545, 555 (W.D.N.Y. 2018) ("[C]ourts have consistently held . . . that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement.").

---

[19]The Superintendent responded to grievance AUB-6602-15 on January 28, 2015, well before plaintiff was released to federal custody in June 2015.  Between January and June 2015, plaintiff filed three other grievances and appealed them to CORC. (Seguin Decl. at ¶ 14, Ex. A at 2-3; Parmiter Decl. at ¶¶ 18-19, Ex. A at 1).

[20]By contrast, this court has previously recommended denying summary judgment where no evidence in the record contradicted a plaintiff's allegation that his ability to file a grievance was thwarted by prison staff.  *See Sawyer v. Locy*, No. 9:19-CV-879 (MAD/ATB), 2020 WL 7684957, at *4 (N.D.N.Y. Oct. 21, 2020), *report and recommendation adopted*, 2020 WL 7382229 (N.D.N.Y. Dec. 16, 2020).  In *Sawyer*, however, the defendants argued that plaintiff failed to exhaust his administrative remedies, yet failed to offer compelling evidence sufficient to meet their burden on the dispositive motion,  such as deposition testimony or party affidavits.

Considering plaintiff's unsupported allegations, along with evidence that plaintiff successfully utilized the IGP and appealed to CORC during the same period of time, the court agrees that there is no applicable exception to the exhaustion requirement, and plaintiff's retaliation claim against defendants CO Gilfus, CO Hesse, and Sgt. Donnelly should be dismissed.

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the motion for summary judgment of the Wilson Elser defendants–defendants Koenigsmann, Jones, Coryer, Donnelly, O'Connor-Ryerson, Gilfus, Hesse, Ashley, Gardner, Dinello, and Mueller–(Dkt. No. 210) be **GRANTED**, and the plaintiff's complaint be **DISMISSED IN ITS ENTIRETY** as against them; and it is further

**RECOMMENDED**, that defendant Jeavon's motion for summary judgment (Dkt. No. 213) be **GRANTED**, and the plaintiff's complaint be **DISMISSED IN ITS ENTIRETY** as against her.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated:  May 13, 2021

Andrew T. Baxter
U.S. Magistrate Judge